OPINION OF THE COURT
Edward J. Greenfield, J.
When the Boom Boom, a 30-foot pleasure boat, was taken at night from its slip in a marine at City Island, a claim on its insurance policy made it necessary for this court to review the *456 17th century terminology which is employed in a marine policy, and to determine as a matter of first impression under New York'law whether a standard marine policy covering the hull against the perils of the seas and against thieves includes coverage for the theft of the entire vessel.
Plaintiff, the corporate owner of a yacht, has alleged that the president of the corporation, the sole person permitted to use the boat, on the evening of September 25, 1980 tied the boat to the dock, locked and chained it, and ascertained that it had been safely secured. The next day he returned and found the lock had been forced, the lines cut, and the boat gone. These facts were reported to the police and the Coast Guard, but the boat was never found.
Asserting that the loss of his boat was occasioned by the act of thieves, plaintiff made claim for the loss of the vessel on its marine policy for hull insurance, which valued the vessel at $40,000. Defendant insurer refused payment, and plaintiff commenced this action.
Plaintiff now moves for summary judgment pursuant to CPLR 3212, on the ground that no issues of fact exist, and that under the terms and conditions of the policy, there having been a theft, defendant is obligated to pay it the agreed value of the vessel. Defendant cross-moves for summary judgment dismissing the complaint on the ground that under the established construction for ocean marine policies there is no coverage for the theft of the vessel, or for its mysterious disappearance.
Marine insurance is of two kinds. It may provide coverage in general terms by covering all risks, or it may provide coverage only as to specified perils. Unlike an "all risks” policy, which ordinarily covers every fortuitous loss that may happen except for those risks specifically excluded or "warranted free” (Atlantic Lines v American Motorists Ins. Co., 547 F2d 11 [1976]) the older historical type of policy of marine insurance insures only those losses which are specified or named. (See, 11 Couch, Insurance 2d §§ 43:1, 43:2; 5A Appleman, Insurance Law and Practice § 3251 et seq.; New Orleans T & M Ry. Co. v Union Mar. Ins. Co., 286 F 32 [5th Cir 1923].)
The language employed in the marine insurance policy here involved has slowly evolved over the centuries, and while much of it speaks in contemporary terms of such things as water skiing and boat trailers, hull insurance is provided as per the enumerated "perils” clause of the policy, and is *457 redolent with the flavor of tar, pitch, and the wind-filled sails of the 17th century: "perils. Touching the adventures and perils which this Company is contented to bear and take upon itself, they are of the seas, fire, lightning, earthquake, assailing thieves (meaning that there must be visible evidence of forcible entry), jettisons, barratry of the Master and Mariners and all other like perils that shall come to the hurt, detriment or damage of the Vessel named herein”.
The terms "the perils of the sea” and "assailing thieves” conjure up a picture of a band of brigands clambering over the sides of a vessel, daggers held in their teeth and cutlasses at the ready, prepared to pillage and plunder. Indeed, in the earlier marine policies, the perils insured against included "Pirates and Rovers, takings at sea and detainment by princes”. (See, for example, the marine policy provisions quoted in Swinnerton v Columbian Ins. Co., 37 NY 174, 177 [1867].) But we need not hark back to the days of yore. In the 20th century we have unhappily become more familiar with the term "hijackers.*’ It is all the same — seizure of a vessel by force. The question presented here is whether the peril insured against of "assailing thieves” covers the surreptitious taking of a yacht. The insurance company insists that the words employed refer only to the removal of personal property from aboard a ship by force or violence, but not to the furtive taking of a ship from its mooring.
There are three ways in which a ship may be wrested from the control of its rightful owner:
1. It may be seized or captured at sea.
2. It may be taken by a person entrusted with the vessel.
3. It may be stolen in port or within the enclosed waters of a particular State.
Capture and seizure at sea (except by acts of war) is considered piracy. Piracy was traditionally defined as an unauthorized act of violence on the open sea against another vessel with intention to plunder. (See, 1958 Geneva Convention on the High Seas art 15 [13 UST 2312]; United States v Peters, 3 Dallas [3 US] 121 [1795].) As a result of the increased activities of Spanish pirates, English marine underwriters dropped pirates and rovers as perils to be insured against, and indeed made it an excluded risk under the "F. C. & S.” (Free of Capture and Seizure) clause, which warrants that the insurance is free of any claim for capture or seizure or taking of the vessel. (See, Delay, Yacht Theft: Loss by Pirates or Assail *458 ing Thieves?, 4 Mar Law 277, 282, n 22 [1979].) The peril of "thieves” was retained.
While to the uninitiated "assailing thieves” may be considered the equivalent of pirates, such thieves are in fact quite different and their domestic depredations are covered while those of international pirates are not. A forcible taking on the high seas is piracy. A forcible taking in port or in local waters is a taking by assailing thieves. It is certainly a theft under the law of New York.
In the earlier marine policies there was no specific coverage against losses by theft. Such losses came under a clause insuring against "all fortuitous circumstances”. (Atlantic Ins. Co. v Storrow, 1 Edw Ch 621, 5 Paige Ch 285 [1835].) Theft by piracy, robbery or other violence was considered a fortuitous circumstance as distinguished from losses caused by failure to exercise ordinary diligence. (Spinetti v Atlas S. S. Co., 80 NY 71, 79 [1880]; see, Delay, op. cit, 4 Mar Law 277, 279 [1979].)
The word "thieves” was included as one of the named perils in a marine policy, and was construed to cover persons other than members of the crew who would commit robbery with force and violence. Thus, if there was pilferage or conversion by master or crew, they would not be considered "thieves” (Marshall v Nashville Mar. & Fire Ins. Co., 20 Tenn 99, 101 [1839]), but there could be coverage for barratry. (Spinetti v Atlas S. S. Co., supra.) However, the New York courts gave the word "thieves” a broader interpretation in Atlantic Ins. Co. v Storrow (supra) and American Ins. Co. v Bryan & Maitland (1 Hill 25 [1841], affd 26 Wend 563). Because they held that the word "thieves” included both violent and nonviolent thefts (both outside and inside jobs), marine insurers in reaction modified the peril insured against to specify "assailing thieves”, so as to require forcible theft to be demonstrated, rather than furtive acts of conversion or embezzlement. (Swift v American Universal Ins. Co., 349 Mass 637, 212 NE2d 448 [1965].) In short, the distinction was drawn between marauders and pilferers.
The defendant insurance company’s contention here is twofold — that this loss cannot be shown to have been caused forcibly by "assailing thieves”, and that in any event there is no coverage when the target of the theft is the vessel itself, rather than property aboard. This court can agree with neither line of argument.
Under the law of New York, the crime of theft at common *459 law has been absorbed into statute in the general definition of larceny. (Penal Law § 155.05.) It concludes a "trespassory taking”, with intent to deprive another of the property. "Robbery” is forcible stealing, but from the person or presence of another. (Penal Law § 160.00.) Theft is a broader concept, and can include the use of force, even though not against a person, such as breaking and entering. This policy was not restricted to protection from "robbers”. When persons unknown came on to the dock in the dead of night, they could not have made off with plaintiff’s boat except through forcible means. The keys to the boat were secure and untouched. They had to break the locks and cut the lines, and they had to do so forcibly. Indisputably, there was a trespass vi et armis.
The vanishing of the ship was a "mysterious disappearance”, not a theft, argues the defendant. There would be a "mysterious disappearance” if the ship had sailed off into the sunset and had never been heard from again. Here, the ship did not drift off, or quietly settle to the bottom. Incontrovertibly, there was a theft. It is precisely to negate the possibility of mysterious disappearance, purloining or pilfering by the ship’s company, or the unaccountable loss of property aboard the ship that the policy calls for physical evidence to show the loss by marauders. "Visible evidence of forcible entry” there had to be, and visible evidence there was. That requirement is designed to exclude a consensual taking (fraud or trick), as well as to rule out conversion or embezzlement. (Note that barratry of the Master and Mariners is still covered.) The breaking of the locks and the cut lines shows what occurred. Compare Swift v American Universal Ins. Co. (supra) where the plaintiff, returning to his yacht after it had been locked up for the night, found the locked doors had been forced open, and his property missing.
The court forcefully declared, "In our view the element of force or violence implicit in the phrase assailing thieves is not limited to violence against the person, as in robbery, but also includes force applied to the ship or to the insured goods in the perpetration of the theft” (supra, 349 Mass, at 641, 212 NE2d, at 450). The court found the Trial Judge had been warranted in finding that the perpetrators who forced the locks to gain entrance to the cabin could be considered "assailing thieves”. (See also, La Fabrique de Produits Chimiques S. A. v Large [1923] 1 KB 203, 208.) And in Feinberg v Insurance Co. (260 F2d 523 [1958]) it was held that even though there was no evidence of a forced entrance into the *460 yacht (a key evidently had been used), where it had been removed from its mooring, ransacked, and left sinking, this was enough like a theft to justify recovery either under the theft coverage or the "like perils” clause.
When someone has made off with the entire yacht, it may no longer be possible to show the forced doors or broken windows aboard, but the cut lines and the vanished vessel should be ample physical proof to any reasonable person that there had been an assault on the boat in the darkness of the night, and that a theft had taken place. The vanishing of the boat is the best visible evidence that there was no mere pilferage of goods or conversion, and that forcible entry had taken place.
The next question to be answered is whether the insurance against "assailing thieves” covers the loss of the entire vessel, or is limited only to the property aboard. There appear to be only two cases in other jurisdictions which suggest such a limitation. This court finds them not to be persuasive authority.
Ordinarily, marine insurance contracts, which are considered unique, are interpreted according to the laws of admiralty and the Federal or general maritime law of the United States. "The language used in the subject marine policy consists of certain words of art and phrases that over generations have acquired content and meaning, revealed through an examination of customs and practices in the field of marine insurance.” (Antilles S. S. Co. v Members of Am. Hull Ins. Syndicate, 733 F2d 195, 201.) English rulings on policies which were developed there can be very helpful, but are not binding. Since judicial interpretations of marine insurance policies affect not only one State, or one Nation, but the general maritime law of the world, these policies are interpreted according to the custom and usage of the maritime industry so as to provide a uniformity of case law, "since harmonious decisions in this field are deemed highly desirable”. (Eagle Star Ins. Co. v International Proteins Corp., 45 AD2d 637, 640, affd 38 NY2d 861.)
However, where there is no applicable Federal legislation or judicial decision, the States are free to apply their own interpretation to marine insurance matters. (See, Wilburn Boat Co. v Fireman’s Ins. Co., 348 US 310 [1955]; Insurance Co. v Board of Commrs., 733 F2d 1161 [5th Cir 1984].)
Defendant urges as controlling the decision of the Fifth *461 Circuit in Felicione & Sons Fish Co. v Citizens Cas. Co. (430 F2d 136 [1970]). That was a bizarre case involving a double murder and a deliberate ramming and sinking of a commercial fishing boat. Neither the facts nor the law there involved require a finding here of no coverage.
In the Felicione case (supra), plaintiffs shrimp boat was boarded in international waters in the Gulf of Mexico by a drunken madman who, enraged when the captain declined to join him in a drink, shot the captain and a crewman dead. The next day he was observed towing plaintiffs shrimp boat with his own vessel. He then was seen to cut the line, ram plaintiffs boat three times, sink it, and depart. Plaintiffs boat was declared a constructive total loss. Its marine policy, as here, covered against the perils of the sea, assailing thieves, and all other like perils, but was warranted free from capture, seizure, and piracy. The trial court found the intruder to be an assailing thief, and not a pirate, and awarded judgment for the full amount of the policy. On appeal, the defendant insurance company insisted that the loss was in fact caused by acts of piracy, and that that was an excluded peril. The appellate court concluded that there was no "assailing thief’ because the intruder had no demonstrated intent to steal the vessel, and in fact scuttled the vessel, and denied coverage. The conclusion that there was no coverage, either because this was an act of piracy in international waters, or because the vessel was not stolen, but destroyed, could be justified on the peculiar facts of the case.
The court went out of its way however to make a pronouncement that was in no way required in arriving at the decision, and did so without historical or legal justification. It declared that it was going to decline to construe "the recondite niceties of verbiage in an ancient clause of an insurance policy” (supra, 430 F2d, at 138), and limit itself to the question of whether the murderer was an "assailing thief’ and then, having found he was not, made uncalled for observations as to whether there could be coverage for the loss of the entire vessel at the hands of a thief. Having already determined that the boarder was an irrational and drunken madman who destroyed, rather than stole the vessel to cover up his heinous crimes, they then declared: "We are convinced that the term 'assailing thieves’ in marine policies provides coverage for theft by force or violence of personal property on vessels, not coverage for the theft of the vessel itself. We have researched the subject exhaustively. All the authorities we found dealing *462 with the term 'assailing thieves’ arise in the context of taking of goods aboard a vessel; none construe the term with a reference to a taking of the vessel itself’ (supra, 430 F2d, at 139). In uttering this dictum, the authorities cited were Swift v American Universal Ins. Co. (349 Mass 637, 212 NE2d 448, supra) and Annotation, 19 ALR3d 1150. But in that case the State Supreme Court, dealing with a policy explicitly covering "theft of the entire Yacht”, as well as "assailing thieves”, held that those who broke into the yacht as it was tied up and stole personal property were "assailing thieves”, and that there could be recovery for the value of the stolen property. There was not one word to suggest that there would be no coverage for "assailing thieves” who might steal the entire boat.
The Annotation cited in 19 ALR3d 1150 (1968) similarly contains no suggestion that there is any case which denies coverage when "assailing thieves” have stolen the entire vessel. The distinction therein discussed, and the subject of all the prior cases, is whether there can be "assailing thieves” when the thieves may be members of the ship’s company, or passengers who may have been guilty of furtive theft or pilfering. While the Felicione court (supra, at 140) found all the prior cases discussing "assailing thieves” arose in the context of a taking of goods from the vessel, and that there was a "paucity of authority” applying the term to the theft of a vessel, it is equally true that no prior case has ever excluded theft of an entire vessel. The earlier cases all discussed the consequences of the taking of goods, but no case held that coverage was restricted only to the taking of goods. The lack of any definitive prior ruling does not demonstrate that such an exclusion "was so generally understood”, but merely that the situation did not previously arise. One can examine all the respected commentators on marine insurance, English and American, in vain and not find any support for this gratuitous dictum.
One Louisiana case, Cambre v Travelers Indem. Co. (404 So 2d 511 [La App 1981]), has followed the Felicione dictum, quoting it in extenso without further comment as the controlling authority. In that case a commercial crabbing and shrimping boat which was left stalled in a channel was later found to be missing. The court found this was not within the "assailing thieves” or "like perils” coverage. There is no reason why that case should be controlling here.
This court concludes that there is nothing in marine insurance law, the Felicione dictum notwithstanding, which re *463 quires that one who has insured his entire vessel cannot recover when that vessel, and not merely the personal items he may have left on board, has been stolen by outside strangers. Even if there were a well-established marine insurance rule on this score (and there is not), the policy has to be viewed in the light of the normal expectations of a noncommercial yacht owner who insures his boat against theft as he insures his car, and not through the eyes of a cargo operator, a regular time charterer, or a commercial fisherman.
As noted in Farmers Home Mut. Ins. Co. v Insurance Co. (20 Wash App 815, 819-820, 583 P2d 644, 646-647 [1978]), involving a yacht insurance policy:
"The United States Supreme Court has never addressed this issue, and no court has considered it in the context of the private, noncommercial use of pleasure craft. We reject [defendant’s] argument because, at least in the noncommercial field, there is no well-established federal rule, and without such a rule, the interpretation of marine insurance policies is left to the states * * *
"It is unreasonable to expect the noncommercial yacht owner to seek insurance protection for the same reasons, with the same expectations, and with the same knowledge of the marine insurance industry as commercial shippers * * *
"Our decision * * * merely recognizes that the courts will not blindly apply esoteric commercial marine standards to noncommercial yacht insurance.”
In considering the meaning of the term "assailing thieves” and "like perils” in an insurance policy offered to laymen, whose only connection with things maritime is an occasional weekend afloat on a local bay, we must consider common parlance — the general understanding of those to whom the policy is offered. "Thieves” are persons who commit theft, and theft has a commonly understood meaning. It is the nature of the larcenous act itself, and not what is taken, which defines a theft. Surely the owner of a private pleasure boat, who is not a grizzled mariner weathered by decades of winds and salt water, could not be expected to know that when he has the hull insured against "assailing thieves” and "like perils” that means he may be covered if his silver cocktail shaker is violently seized, but that if someone makes off with the entire vessel his insurer may deny coverage. What protection is it for a City Island boater to be assured that he is fully covered for loss by earthquake, but the coverage for the "thieves” he *464 thinks he has insured against is partial, and gives him coverage only for property aboard, but not for the ship itself?
The policy read as a whole nowhere excludes theft of the entire vessel. Certainly no specific exceptions for theft of the vessel are contained in the policy, although the specific exclusions and "warranted free” provisions are both numerous and detailed. The policy does have explicit exclusions for wrongful conversion and loss or damage to specified equipment. As the vessel is warranted to be a private pleasure yacht, not to be used for commercial purposes, there is no coverage for freight or cargo carried aboard the vessel (booty for the assailing thief), and there is a requirement that such property as fishing chairs must be secured to the vessel. What, then, does $40,000 of hull insurance for a private pleasure boat purport to cover?
The declarations page states under coverage number 1: "Hull insurance as per Sec. 'A’ ”, with $40,000 as "amount of insurance and agreed valuation.”
An examination of the policy reveals that the terms "hull” and "vessel” are used interchangeably.
Section A of the policy states: "Hull valuation and constructive total loss: the vessel including all the property insured under this section is and shall be valued at the sum stated in coverage No. 1 on the declarations page, but no recovery for a total or constructive loss shall be had hereunder unless all said property is lost absolutely or unless the expenses of recovery and repairing the vessel shall exceed that amount”.
On the bottom of the declarations page it states:
"Hull deductibles: $400.00: theft
$400.00: all other loss or damage”.
There is a $400 deductible for theft of property from the vessel, but there is no deductible for a total loss. If only the property on board the vessel is being insured against, then it would not be necessary to insure the hull, but only "property on board”. Interesting, in Bobley v California Union Ins. Co. (52 AD2d 557 [1976], affd 41 NY2d 955), the insurer seeking to avoid coverage took the obverse position to that urged here, and contended that $85,160 worth of jewelry stolen from aboard a boat was not covered by the marine policy because it covered only theft of the vessel and appurtenances.
The fortuitous events insured against in the marine policy’s perils clause do not distinguish between loss of the entire ship *465 and something less. We have a series of events set forth. If a ship sinks, is stranded, or wrecked through the perils of the sea, is there any doubt the insurance is for the loss of the whole ship? Similarly, if it is destroyed by fire, lightning, or earthquake. Before takings by pirates or rovers were excluded, is there any doubt that if they took the entire vessel the insurance would cover? Even the insurance against barratry, which covers fraud or criminal knavery by the Master or Mariners against the owners, affords coverage for loss or seizure of the vessel, and not merely the cargo aboard. (See, Arnould, Marine Insurance § 838 [13th ed 1950]; Earle v Rowcroft, 8 East 126, 103 Eng Rep 292 [1806]; Heyman v Parish, 2 Camp 149 [1809].) Why is it different for the risk of assailing thieves? Why is that peril to be deemed as covering only a partial taking? There is no logical basis for differentiating between the enumerated risks and holding that some are for full coverage, and some for partial coverage only.
In addition, we have to consider even if not covered by the specifically enumerated perils, whether plaintiffs loss was occasioned by "other like perils that shall come to the hurt, detriment or damage of the Vessel named herein”. (Note — not merely to the damage of property aboard.) Of course, the "other like perils” clause is to be read in the light of the perils previously specified. (11 Couch, Insurance 2d § 43:3; Arnould, Marine Insurance § 860 [13th ed].) But unless specifically excepted, perils similar in kind but not exactly as enumerated may be covered under this clause. Thus, where one British ship was sunk when mistaken for an enemy, this was held a like peril (Cullen v Butler, 5 M & S 461, 105 Eng Rep 1119 [1815]), as was the throwing overboard of money to prevent capture, which was neither jettison nor piratical taking, strictly speaking. (Butler v Wildman, 3 B & Ald 398, 106 Eng Rep 708 [1820] — both cases cited in Arnould, op. cit.) Similarly, in Feinberg v Insurance Co. (260 F2d 523, supra) the unlocking and scuttling of a 42-foot cabin cruiser, even if the result of vandalism rather than theft, was held to be sufficiently similar to the enumerated perils so that "what happened to the entire vessel, if not a theft, was at least so very much like a theft that the harm which came to her is covered by the 'all other like perils’ clause” (supra, 260 F2d, at 528). Rejecting the contention of the lower court that the "like perils” clause is "essentially a flourish, adding nothing of substance”, the Court of Appeals declared: "Literary embellishment has no place in an insurance policy. On the contrary *466 it is the universally accepted rule that words used in such a document must be presumed to have been used on purpose to convey some meaning. Thus, as a corollary, meaning must be given to every word used in an insurance policy if that be possible” (supra, at 527). Certainly here, if plaintiffs loss was not by "assailing thieves”, it was so very much like it as to be covered by the like perils clause. Certainly, in construing the policy, plaintiff is entitled to have any ambiguities resolved in his favor. (Lipton v Liberty Mut. Ins. Co., 34 NY2d 356.)
Plaintiff’s motion for summary judgment is granted. Since there is no deductible for a total loss, plaintiff is entitled to judgment in the sum of $40,000 as the agreed valuation of the vessel. The defendant’s cross motion to dismiss the complaint is denied.